J-S05030-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.G.-H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2624 EDA 2024 |

Appeal from the Order Entered September 4, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001586-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: B.D.G.-H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2625 EDA 2024 |

Appeal from the Decree Entered September 4, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000141-2022

BEFORE:  BOWES, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED MARCH 3, 2025**

J.H. (Father) appeals from the decree granting the petition filed by the

Philadelphia Department of Human Services (DHS) and involuntarily

terminating Father's parental rights to B.G.-H. (a daughter born in September

2019) (Child); and the order changing Child's permanency goal from

_____

[*] Former Justice specially assigned to the Superior Court.

reunification to adoption.[1]  After careful review, we affirm the decree and order.

The family came to DHS's attention in September 2019 following a report alleging that Mother and Child tested positive for PCP after Child's birth. N.T., 9/4/24, at 7.  Upon investigation, detailed *infra*, DHS determined that neither Mother nor Father were able to provide appropriate care for Child.[2] On October 7, 2019, DHS obtained an order of protective custody, and Child was temporarily committed to DHS.  *Id.* at 8; Order of Protective Custody, 10/7/19.

On October 24, 2019, the trial court[3] adjudicated Child dependent, and ordered that Child be placed in foster care.  The trial court directed Father to 1) report to the Clinical Evaluation Unit for a dual mental health/drug and alcohol diagnosis assessment; 2) submit to random drug screens; 3) attend parenting classes; and 4) provide proof of employment.  The trial court permitted Father supervised visits with Child.

The trial court held permanency review hearings in January, July, and December 2020; March, July, September, and December 2021; April, July,

---

[1] The trial court also involuntarily terminated the parental rights of Child's mother, A.G. (Mother).  Mother is not a party to the instant appeal.

[2] Father was not residing with Mother and Child at the time.  *See* N.T., 9/4/24, at 9, 12.

[3] The Honorable Deborah L. Canty presided over Child's dependency and termination proceedings.

and October 2022; and January and April 2023. The trial court consistently found that DHS made reasonable efforts to finalize Child's permanency plan; however, Father largely made minimal to moderate progress towards alleviating the circumstances necessitating Child's placement.

On March 2, 2022, DHS contemporaneously filed a petition to involuntarily terminate Father's parental rights (TPR petition) to Child, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and a petition to change Child's permanency goal from reunification to adoption. In its TPR petition, DHS alleged that Father "is not a viable permanency option … as he has failed to achieve his [court-ordered] objectives or follow [c]ourt orders. [Father] has not consistently … visited [Child] throughout her time in placement." TPR Petition, 3/2/22, at 25.

On July 13, 2022, the trial court held the TPR hearing in abeyance "for further investigation of [the] appropriate [g]oal." Continuance Order, 7/13/22.[4] At the permanency review hearings following the trial court's July 13, 2022, continuance order, the court consistently found that Father failed to attend Child's medical appointments[5] or obtain appropriate housing for Child.

_____

[4] The continuance order and certified record do not reflect whether the TPR hearing was held in abeyance at the request of a party or at the trial court's own initiative.

[5] At the TPR hearing, DHS social worker Samia Lyons (Ms. Lyons) testified that Child suffers from severe gastrointestinal issues that require Child to adhere to a strict diet. *See* N.T., 9/4/24, at 18 (Ms. Lyons testifying that
*(Footnote Continued Next Page)*

On July 6, 2023, DHS contemporaneously filed an amended TPR petition based on the same subsections of Section 2511(a) described above, and an amended petition to change Child's permanency goal from reunification to adoption. In its amended TPR petition, DHS included the additional allegation that Father "has not allowed [the Community Umbrella Agency (CUA)] to conduct a home assessment [of Father's residence]." Amended TPR Petition, 7/6/23, at 26 (unpaginated).

Following numerous continuances, the matter proceeded to a TPR hearing on September 4, 2024. Father appeared, represented by counsel. Child did not appear, but was represented by a guardian *ad litem* (GAL), who indicated there was no conflict between Child's best and legal interests. *See* N.T., 9/4/24, at 119-20; *see also Interest of H.H.N.*, 296 A.3d 1258, 1264 (Pa. Super. 2023) ("[W]here there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests."). DHS presented the testimony of DHS social work service manager Devin Rogoshewski (Mr. Rogoshewski); Ms. Lyons; and CUA case manager Brieyanna Wilson (Ms. Wilson). Father testified on his own behalf.

Mr. Rogoshewski testified that, in 2019, he worked as a DHS investigator. *Id.* at 6. Mr. Rogoshewski explained that in September 2019,

_____

Child's failure to adhere to her diet results in "very intens[]e pain"). Ms. Lyons further testified that Child has been diagnosed with autism. *Id.* at 49-50.

- 4 -

he received a report indicating that, following Child's birth, Mother tested positive for marijuana and PCP; Child tested positive for PCP. *Id.* at 7. Mr. Rogoshewski testified that he spoke with Father concerning the allegation, and Father "downplay[ed Mother's] substance [abuse]." *Id.* at 9. Mr. Rogoshewski explained that though Father indicated that he was "ready, willing, and able" to care for Child, DHS was concerned about Father's ability to parent Child due to Father's work schedule and housing situation. *See id.* (Mr. Rogoshewski testifying that Father's mother (paternal grandmother), with whom Father resided, asked Mr. Rogoshewski, "Who's going to care for [C]hild?").

Ms. Lyons testified that she had worked with the family as their DHS social worker for two years, until her assignment concluded on July 24, 2024. *Id.* at 14. Ms. Lyons explained that, during her supervision of the family, Father's primary goals included attending Child's medical appointments, bringing appropriate foods for Child during visits, and allowing CUA to conduct a new home assessment.[6] *Id.* at 33.

Ms. Lyons testified that while Father's initial, supervised visits with Child were consistent and appropriate, when Father was permitted unsupervised

---

[6] Significantly, Father's residence had a room that, according to Ms. Lyons, needed "clearing out … to add adequate space for [Child]." N.T., 9/4/24, at 33. A CUA social worker advised Father of this necessary adjustment during a previous home assessment "over a year" before the TPR hearing. *Id.* at 33, 42.

visitation, he provided Child with inappropriate food. *Id.* at 37. Ms. Lyons testified that in March 2024, Child stated "she no longer wanted to visit [Father]." *Id.* at 35; *see also id.* at 36 (Ms. Lyons testifying that Child advised her that during visits, "all [Father] would do was ride around in the car with her, and that's not something she wanted to do, and she would be in the car for too long."); *id.* at 54 (Ms. Lyons testifying that she was "trying very, very hard to get [Child] to [visit Father;] however, … [Child] would not budge.").

Concerning housing, Ms. Lyons testified that she had been assisting Father with securing appropriate housing for the two years she provided services to the family. *Id.* at 41. Ms. Lyons explained:

> I've had several conversations with [F]ather about housing. Father shows us that he has money. He pulls out money. Everything surrounds money, and I just ask him, … "Why don't you just complete this one goal when it comes to housing? That's all you have to do."
>
> And he[ said,] "Oh, I'm applying here. I'm applying there." Then we referred him for housing. He didn't like the housing in the areas that we referred him to. He stated that he didn't want to move [Child] to [paternal grandmother's residence], which is the room that we're referencing in the single case plan, which [Father] was requested to clean out over a year ago.
>
> So, mainly that's what I was trying to work with [F]ather on[;] however, it was never successful.

*Id.* at 41-42; *see also id.* at 44 (Ms. Lyons confirming that, "throughout the case, [Father] only had to clean out that room [in paternal grandmother's

house], and then his hous[ing] would be safe and accessible for reunification.").

Ms. Lyons testified that Child refers to foster mother as "mom," and that Child and foster mother share a strong bond.[7] *Id.* at 30. Ms. Lyons explained that Child and foster mother

> have a very great and positive relationship. I've observed them on numerous occasions…. [M]y observation of [Child] and [foster mother] is that [Child] loves [foster mother]. [Child and foster mother] are very well[-]bonded and connected. [Child] looks to [foster mother] for almost everything, as well as the other young child in the [foster mother's] home. [Child] identifies [the other child in the home] as her sister.

*Id.* (paragraph break omitted); *see also id.* at 52 (Ms. Lyons opining that Child would suffer emotional trauma if she were removed from foster mother's care). Conversely, Ms. Lyons testified that Child does not look to Father for comfort, support, or safety. *Id.* at 40-41.

Ms. Wilson testified that she had recently been assigned to work with the family. *Id.* at 72. Ms. Wilson confirmed that Child is "medically fragile[,]" and detailed Child's numerous "specialty appointments," including ophthalmology, neurology, audiology, otolaryngology, gastroenterology, and pulmonology. *Id.* at 76, 80. Ms. Wilson agreed that foster mother is "very detailed and organized about [Child's] medical care[.]" *Id.* at 80.

Ms. Wilson explained that Father, however,

_____

[7] The record discloses that foster mother is a preadoptive resource. *See* N.T., 9/4/24, at 79, 145.

has not done anything to learn about how to care for [Child's] medical needs[.] I do believe that [Child] going from being with [foster mother, where she has] all of her needs met[,] and her medical and specialty appointments met[,] to returning [to Father], who ha[s] no knowledge of her specialty appointments, will be detrimental to [Child's] growth.

*Id.* at 81-82.

Ms. Wilson further testified that she had recently spoken with Child concerning whether Child desired to visit Father, and Child related that she did not want to continue visits with Father. *Id.* at 83.

GAL also addressed the trial court, indicating that, based on her interactions with Child, Child "is thriving [in foster mother's home]. [Child] loves living there. She wants that to be her forever home." *Id.* at 120.

Father testified he did not attend Child's medical appointments primarily because he had difficulty accessing the online portal that provided the dates and times of Child's appointments. *Id.* at 92-93. Father acknowledged his awareness of Child's dietary restrictions and needs, but nevertheless occasionally provided Child with inappropriate meals. *Id.* at 94; *see also id.* (Father testifying that when Child was around other children, she would want to eat what they were eating, and he would allow Child to do so).

Father agreed that "over the life of the case, [he had not] made a home for [C]hild." *Id.* at 102. Father testified that paternal grandmother's house has a room large enough to accommodate Child, but it is cluttered with his clothing and shoes. *Id.* at 101. Father confirmed that he had failed to clean out the spare room to make it available to Child. *Id.* Father further

acknowledged that he made a "fair" salary, had savings, and did not pay rent to paternal grandmother. *Id.* at 103.

At the conclusion of the TPR hearing, the trial court changed Child's permanency goal to adoption, and involuntarily terminated Father's parental rights to Child, pursuant to Section 2511(a)(2) and (b).[8] Father filed timely notices of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statements.[9] The trial court filed a Rule 1925 opinion indicating that it was relying upon the reasoning it set forth at the conclusion of the TPR hearing.

Father presents the following three issues for review:

1) Did the [trial c]ourt err in terminating [Father's] parental rights based on insufficient evidence being introduced to establish grounds under 23 Pa.[]C.S.A. § 2511[](a) and (b)?

2) Did the [trial c]ourt err[] in terminating [Father's] parental rights solely due to environmental factors in violation of 23 Pa.[]C.S.A. § 2511[](b)?

3) Did the [trial c]ourt have insufficient evidence to find it was in the bests interests of [C]hild for the goal to be changed from reunification to adoption?

Father's Brief at 7.

_____

[8] During closing arguments, DHS withdrew its termination request premised on Section 2511(a)(5) and (8). *See* N.T., 9/4/24, at 127. The trial court found that DHS failed to meet it burden under Section 2511(a)(1). *Id.* at 138 (trial court finding credible Father's explanation concerning his efforts to access the online portal to view Child's medical appointment information).

[9] This Court *sua sponte* consolidated Father's appeals.

We review the termination of parental rights for an abuse of discretion. *See Interest of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). This standard of review requires appellate courts to

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court

determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted). The standard of "clear and convincing" evidence is defined as "evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Int. of R.H.B.*, 327 A.3d 1251, 1256 (Pa. Super. 2024) (quotation marks and citation omitted). Finally, this Court need only agree with the trial court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

As Father's first two issues are closely related, we consider them together. In his first issue, Father challenges termination pursuant to Section 2511(a)(2) and (b). Father's Brief at 13. We initially consider Father's challenge to the trial court's finding under Section 2511(a)(2), which provides as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Addressing Section 2511(a)(2), Father recognizes that "[i]n order to utilize Father's current home, a room would have to have been cleared out …." Father's Brief at 13. Father contends, however, that had DHS placed Child with Father "at the beginning of the case, then [Father] obtaining alternative housing or altering [paternal grandmother's] home would have been unnecessary." *Id.*

> Father continues:
>
> When [C]hild was originally placed, [DHS] was considering [placing Child with] Father …, as he was holding himself out to be ready, willing, and able to assume custody of [C]hild. The only two reasons why [DHS] did not were 1) [DHS] felt Father "downplayed" Mother's substance abuse issues[,] and 2) Father worked long hours as a truck driver. [DHS] never produced evidence as to either of these assertions. Furthermore, even assuming Father did downplay Mother's substance abuse and that he worked long hours, [n]either of these facts … in themselves[] establish an inability to properly care for [Child].

*Id.* (record citations omitted).

To satisfy the requirements of Section 2511(a)(2), the petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the

- 12 -

incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination under this subsection "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.*

"[S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019). However, "**while sincere efforts to perform parental duties can preserve parental rights under subsection 2511(a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection 2511(a)(2)**." *In re Adoption of C.M.*, 255 A.3d 343, 365 (Pa. 2021) (citation and brackets omitted; emphasis added). We have recognized that a child's life "cannot be held in abeyance while a parent attempts to … assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

At the conclusion of the TPR hearing, the trial court summarized its findings with respect to Section 2511(a)(2):

The testimony here today is [F]ather's sole objective that was left for him to address was housing. … In this case, [F]ather acknowledged that CUA, Ms. Lyons specifically, told him that, having assessed [paternal grandmother's] home where he was living …, the only thing he needed to do was clean out the back room, and that [Ms. Lyons] would come back and reassess the home, and [Child] could move in with him.

Father himself acknowledged that that was what was told to him, that all he had to do was clean out the back room. Father described the room as … a 10 by 12 [foot] room, plenty of room for a four[-], going on five-year-old child.

[Father's] own testimony was what was in [the back room] was clothes and lots of shoes and sneakers[. H]e didn't have a real good reason as far as I'm concerned, based on what he said, as to why he didn't clean [the room] out.

[Father claimed] that he's been trying to find another house, but I don't find any of that credible or compelling. If you want your child back and you're serious about it, [F]ather's actions belie his words.

[Father's] words say, "Yes, I want my child back and I'm doing everything I need to do." [B]ut his actions belie his words because the only thing he needed to do for [Child] to be reunified was clean out that back room. And by his own testimony, he knew that, and he did not do that.

N.T., 9/4/24, at 139-40 (some paragraph breaks omitted).

Upon review, the trial court's findings are supported by the record, and its legal conclusion is sound. *See K.T.*, 324 A.3d at 56. The record confirms that in the nearly five years that Child has been in placement, Father has been unable or unwilling to provide appropriate housing for Child. *See* 23 Pa.C.S.A. § 2511(a)(2). Moreover, the trial court acted within its discretion when it found incredible Father's claim that he had diligently been seeking appropriate housing for Child. *See L.C.J.W*, 311 A.3d at 48 ("It is the province of the

[trial] court to assess credibility and resolve any conflicts in the evidence, and in doing so it is free to believe all, part, or none of the evidence presented." (citation and quotation marks omitted)). Accordingly, we discern no abuse of the trial court's discretion in finding that DHS proved, by clear and convincing evidence, that termination was warranted pursuant to Section 2511(a)(2).[10]

Father next argues that the trial court improperly terminated his parental rights "solely due to environmental factors, in violation of … Section 2511(b)[.]" Father's Brief at 14. Father claims that he was unable to provide appropriate housing for Child due to circumstances outside of his control, including 1) his belief that the housing referrals he received from CUA were in locations unsafe for Child, 2) "there was not enough space for [] Child" in paternal grandmother's home, and 3) because Father is "impoverished[.]" *Id.* at 14-15.

When the trial court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. **The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing**,

---

[10] Father offers no argument regarding whether the best interests of Child support termination pursuant to Section 2511(b). Consequently, this claim is waived. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority." (citations omitted)). Even if this claim were not waived, however, it would merit no relief for the reasons discussed *infra*.

furnishings, income, clothing and medical care **if found to be beyond the control of the parent**. ….

23 Pa.C.S.A. § 2511(b) (emphasis added).

"Notably, courts should consider the [termination of a parent's rights] from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." **K.T.**, 296 A.3d at 1105. Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **Id.** (citation omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." **Id.** at 1113.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

**Id.** (footnote and citations omitted).

Instantly, contrary to Father's claim that the trial court terminated his parental rights to Child for circumstances beyond his control, in violation of Section 2511(b), the trial court specifically found that Father had housing available for Child, but he failed to make it habitable. **See** N.T., 9/4/24, at 139-40; **see also id.** at 140 (the trial court stating, "[T]he only thing [Father] needed to do for [Child] to be reunified was clean out that back room. And by his own testimony, he knew that, and he did not do that."); **id.** at 101 (Father conceding that he was "guilty of" failing to clear out space for Child in

- 16 -

his mother's home); *id.* at 103 (Father testifying that he was employed, had savings, and did not pay rent to paternal grandmother).

Accordingly, the record amply supports the trial court's finding that Father failed to take steps **within his control** to provide appropriate housing for Child. *See* 23 Pa.C.S.A. § 2511(b). Father's Section 2511(b) challenge on this basis fails.

Additionally, the trial court found that Child's primary attachment and bond is to foster mother:

> [Child] knows who [F]ather is, and at different points in time [was] very excited to see [F]ather. … [However,] Ms. Lyons testified … that [Child's] primary attachment is to [] foster [mother,] … and that is because this case has dragged on for almost five years, with [C]hild in another home where she was allowed to develop affections more [towards] foster [mother] and [less towards Father].
>
> And the one thing that [Father] could've done to change that and get to overnight visits, and get to reunification, he chose not to do. And so, I am going to find that, while [Child] may have a relationship with [Father], me terminating involuntarily [Father's] parental rights based on [Child's] relationship with [] foster [mother] will not cause [Child] detrimental impact to the point where she cannot move on.

*Id.* at 140-41 (some paragraph breaks omitted).

Our review confirms that the trial court's factual findings are supported by the record, and its legal conclusions are sound. *See K.T.*, 324 A.3d at 56. The record supports the trial court's findings that Child and foster mother share a strong bond, and that termination serves Child's best interests. *See* N.T., 9/4/24, at 30, 40-31, 52; *see also id.* at 120 (GAL reporting to the trial

- 17 -

court that Child is "thriving" with foster mother). Accordingly, we discern no abuse of discretion in the trial court's determination that termination is warranted pursuant to Section 2511(b).

In his final issue, Father argues that insufficient evidence supported the trial court's order changing Child's permanency goal from reunification to adoption. Father's Brief at 15. However, as we concluded the trial court properly terminated Father's parental rights pursuant to Section 2511, this issue is moot. ***See Interest of D.R.-W.***, 227 A.3d 905, 917 (Pa. Super. 2020) (holding a parent's challenge to a child's permanency goal change was moot after this Court affirmed the trial court's termination decrees).

Decree and order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/3/2025